Both plaintiff and defendant have appealed from the judgment of the District Court in this case, awarding the plaintiff compensation at the rate of $6 per week for a period of 300 weeks. Plaintiff contends that compensation should be increased to $17.40 per week and defendant contends that no compensation whatever is due.
[1] Before answering, defendant filed an exception of no cause and no right of action to the demand on behalf of the minor, Charles Lewis Fields, for the reason that his mother did not qualify as his natural tutrix and it was argued in the district court and here that it is only in cases where there is a surviving widow or widower that appearance can be made for a minor without a formal appointment as tutor or tutrix.
Act No. 20 of 1914, as amended, Section 8, subd. 2, par. G, Act No. 242 of 1928, p. 360, Dart's Statutes, Section 4398, subd. 2, par. G, reads as follows: "Where there is a surviving widow, widower and child or children, entitled to compensation, the compensation above described shall be paid entirely to the widow or widower for the common benefit of such widow or widower and child or children, and the appointment of a tutor [shall] not be necessary. Where there is no surviving parent, and a child who is entitled to compensation, payment shall be made to the duly appointed tutor."
We think the construction contended for by defendant on this provision is too narrow and we agree with the district judge that the exception is without merit. Defendant's answer is a general denial of all the substantial allegations of the petition.
The facts of the case are as follows. Mariah Fields, plaintiff, suing on behalf of herself and a 15 year old son named Charles Lewis Fields, is the mother of John D. Fields, who was about 20 years old and single. The mother, who is a widow, and her 15 year old son live at Calhoun in a house belonging to the State at the Experimental Station. She pays no rent for the house and claims that she and this 15 year old son, who was a brother of John D. Fields, were supported entirely by her deceased son, John D. Fields.
John D. Fields was employed by the defendant as a laborer in the operation of its mill near West Monroe. Large quantities of pulpwood are shipped to the mill by rail, some in box cars, which must be unloaded by hand, and some in flat cars, which are unloaded by what is referred to in the testimony as a drag line, which carries a bucket to pick up wood from loaded cars, and the bucket is then swung over a conveyor trough and the wood then released. There are some five or six of these troughs, each with an endless chain at the bottom, and when the wood is dropped in the trough, the chain takes it up into the mill where it is processed to make paper.
The distance between the cars being unloaded and the top of the conveyor trough is only two or three feet, but the trough *Page 757 
is slanting and at the bottom the distance is probably five or six feet. Some of the wood fails to fall into the trough and falls to the ground, and several laborers are employed to pick up this wood from the ground and throw it into the trough. Sometimes wood falls under cars and on to the railroad tracks and it is the duty of these laborers to keep the track clear of wood.
A short time before John D. Fields was injured, as a result of which he died, the cars, either three or four, that had been spotted on the tracks for unloading, were unloaded and the foreman asked these laborers if everything was clear, and, being told that it was, he told them that he was going to get the locomotive to come down and pull out the empty cars so that more loaded cars could be spotted for unloading, and they were told to keep clear. While waiting for more loaded cars to be spotted, these laborers had no duties to perform, except to remain on the job ready for work when more cars were brought in.
The exact time that elapsed is not shown, but it must have been some 15 to 30 minutes before the locomotive came to pull the empty cars out. When the locomotive started pulling the cars out, John D. Fields commenced screaming and one of the other laborers looked toward the locomotive and saw deceased hanging to the car and being dragged. When the train was stopped, he fell beside the track between one of the conveyor troughs and the track from which the cars were being pulled. One of his legs was mashed and the other broken. He was carried to a hospital in Monroe and died shortly thereafter.
A short time before deceased was injured, he and another laborer, named Sartor Holland, had been sitting down together on a piece of wood with their backs toward the trough and their feet toward the railroad tracks. Deceased got up and left, and the next time that Holland saw him was after he had screamed. Holland says, "when I looked around and seen him, he looked like he was reaching for something." Asked whether or not he was under the freight train, he answered, "it seems like he was out but he was caught on the side in some way." Holland says that he appeared to have been dragged about three car lengths altogether. Several people ran to deceased, and he asked for water, and some of the negroes went to get some water, but a white man, named R.B. Shriver, stayed there, and he testified that he asked deceased how it happened and that deceased replied that he didn't know, that he was asleep and when he woke up the train had him.
[2] It is admitted by defendant, as it must be, that the accident occurred in the course of decedent's employment. As late as October 9, 1946, in the case of Clark v. Employers Liability Assurance Corporation, Limited, et al., La. App.,27 So.2d 464, the Court of Appeal, First Circuit, dealing with this question, had this to say: "The provision that an accident, to entitle the employee to compensation, must occur 'in the course of his employment', means nothing more than that it must have taken place during the hours of employment and not at any other time. Act No. 20 of 1914, as amended."
The Court of Appeal in the Clark case cited Kern v. Southport Mill, Limited, 174 La. 432, 141 So. 19, 21. In the Kern case, a number of cases from this and other jurisdictions are cited, including Myers v. Louisiana Ry. Nav. Co., 140 La. 938, 74 So. 256, decided in 1917, not long after the adoption of Act No. 20 of 1914.
[3] Defendant strenuously contends, however, that the accident in this case did not arise out of the employment. The Clark case, supra, cites the following from the Kern case, supra, as the determining factor as to whether the accident arose out of the employment: " 'In determining, therefore, whether an accident "arose out of" the employment, it is necessary to consider only this: (1) Was the employee then engaged about his employer's business and not merely pursuing his own business or pleasure; and (2) did the necessities of that employer's business reasonably require that the employee be at the place of the accident at the time the accident occurred?' "
[4] There can be no doubt whatever that in this case the necessities of the employer's *Page 758 
business reasonably required that the deceased be at the place of the accident at the time it occurred. It is contended by defendant that deceased had gone to sleep under the railroad car, which he had been warned not to do, and that therefore he was not engaged about his employer's business but was pursuing his own business or pleasure. The evidence that he was asleep consists of the testimony of R.B. Shriver, operator of the drag line for an independent contractor and not directly an employee of defendant, to the effect that immediately after the accident, and before deceased had been moved, he asked deceased how it happened and deceased answered that he was asleep and when he woke up the train had him. This testimony was objected to by plaintiff because it was not covered by the pleading. The lower court held that this evidence was admissible as a part of the res gestae and we approve the ruling.
[5, 6] We think, however, that in the first place, this is the weakest class of evidence. The person who is said to have made the statement is dead. He can make no denial of any statement attributed to him. In the second place, the statement, if accepted, does not prove that deceased was asleep under the car. It is claimed only that he said he was asleep, and when he woke up the train had him. From that statement defendant concludes that he must necessarily have been asleep under the car, but there is no direct evidence that this is true. On the other hand the witness, Holland, who appears to have been the only person to see deceased during the time he was being dragged by the train says that it seems like he was not under the train but was caught onto the side in some way. He could have been asleep near the car where his presence was required and could have been caught and dragged under the train in some way. We do not know from the evidence whether he was asleep under the car or not. In fact, we know that he was asleep at all only from this weak class of evidence by one witness as to the statement of deceased. It is a well known fact that negroes go to sleep very easily in daytime or nighttime, if not working, and as this accident happened at two or three o'clock in the morning, it would not be unusual for this boy to go to sleep during this period of waiting for more loaded cars to be brought in to be unloaded.
Defendant offered evidence to show that deceased and other workers had disobeyed instructions given by the foreman to stay from under the cars. Plaintiff objected to all this class of evidence contending that defendant was attempting to prove the violation of an order, rule, or regulation, of the employer, and that same had not been pleaded. Defendant says that the violation of rules and regulations is not a defense under the compensation act and that the evidence was not offered for that purpose, but for the purpose of showing that deceased did not receive injury by accident arising out of and in the course of such employment. The conclusion we have reached renders immaterial a discussion of the admissibility of this class of testimony in this case.
The deceased, though not actually working at the time, was being paid for this time that he waited for other cars to be brought in to be unloaded and it was his duty to stay and wait for these cars, so that it cannot be said that he was doing anything for himself or pursuing his own pleasures. His employment reasonably required him to be at the place where he was injured. We are of the opinion that the evidence falls short of proving that deceased lay down under the car and went to sleep though he probably was asleep near the railroad track where his work required him to be. The most that can be said is that it was probably his negligence in going to sleep that caused the accident, but negligence of the employee is not a defense in a compensation suit.
Counsel has cited a number of cases from this and other jurisdictions and if the facts in this case were found to be the same or similar to facts in the cases cited, the decision might be different. The facts in Evans v. Central Surety Ins. Corp., La. App., 10 So.2d 406, in no way resemble the facts of this case and the same may be said of Pierre v. Barringer,149 La. 71, 88 So. 691, in which case a colored boy, hired as a fireman in a saw mill, left his place *Page 759 
of duty and went over to where the lumber was being sawed, and got his hand hurt in the saw. In the case of Piske v. Brooklyn Cooperage Co., 143 La. 455, 78 So. 734, deceased was employed to work inside a building at a box factory, and without any reason or necessity whatsoever, left the building where his duties required him to be, and was found by his cries for help, with his right leg pinned under the wheel of a box car some 40 feet from the building. It was there held that he was not engaged in the scope of his employment. The facts in that case are not the same as the facts in the instant case.
A number of cases from other jurisdictions have been cited but from our examination of these cases, the facts found by the courts in the various cases cited are different from the facts that we have found in this case and for that reason it is unnecessary to discuss the facts and the holding of the courts in these cases.
In 4 Words and Phrases, Perm.Ed., beginning at page 18, will be found hundreds of cases cited defining the meaning of the part of the statute requiring that in order for recovery to be had, the accident must arise out of and in the course of employment. Different courts of different jurisdictions and even different courts of the same jurisdiction have not been uniform in determining the meaning of the statutes, and applying them to different states of facts.
[7] This leaves for consideration the question of the award that should be made in this case. The record in this case shows conclusively that the deceased made regular contributions to his mother's support by buying groceries for her and giving her sums of money, but all of the testimony is indefinite as to the amount he contributed. We are not convinced that she and her minor son were wholly dependent on deceased, but we do believe that she made out a case of partial dependency and accordingly we approve the award of $6 per week, which would be $3 for each dependent.
The decree in this case awards plaintiff, Mariah Fields, individually and for the use and benefit of the minor, Charles Lewis Fields, $6 per week for and during a period of 300 weeks, payable in weekly installments beginning July 21, 1945, with five per cent per annum interest on each installment from due date until paid. The judgment should be amended so as to award the plaintiff, individually, and for the use and benefit of the minor, $6 per week for a period not exceeding 300 weeks.
For the reasons assigned the judgment is amended as above set forth and as amended is affirmed at the cost of defendant in both courts.